## WESTERN CASUALTY & SURETY CO. v. UNITED STATES.

No. 48819.

United States Court of Claims.
Jan. 13, 1953.

As Modified Feb. 3, 1953.

John J. Wilson, Washington, D. C., for the plaintiff. Roger Robb and Jo V. Morgan, Jr., Washington, D. C., were on the briefs.

Gilbert E. Andrews, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff sues for $19,567.35, the admitted value of certain plumbing and heating materials purchased by the United States. The Government purported to purchase the materials from the Meyer Plumbing and Heating Company, a corporation hereinafter called Meyer, but the plaintiff says that it held a chattel mortgage on the materials at the time they were sold, and that Meyer, therefore, had no right to sell them to the Government. The plaintiff's asserted chattel mortgage was not recorded, but the plaintiff says that that is immaterial because, it claims, the Government had notice of its interest in the materials, and also because the Government did not pay Meyer for them, but only set off the purchase price against taxes which Meyer owed to the Government.

In March 1942, one Blair, a contractor, made a contract with the Government to perform certain construction work at Camp Atterbury, Edinburg, Indiana.

Blair gave two subcontracts for plumbing and heating work to Meyer, one for $363,978.00 for the work in divisions A–1C and A–1D of the project and the other for $390,000.00 for the work in divisions A–2C and A–2D. Meyer gave performance and payment bonds to Blair and the plaintiff became surety for Meyer on those bonds. As a part of the consideration to the plaintiff for becoming surety on the bonds, Meyer, in his application to the plaintiff, assigned to the plaintiff as collateral all of its right, title and interest in all machinery, equipment, plant, tools and materials which were then or might thereafter be about or upon the site of the work to be performed under the subcontracts. The assignment, by its terms, was to become effective upon the happening of any one of several described events, one of which was the abandonment, forfeiture or breach of the subcontracts, or of the bonds.

One of the terms of the payment bonds was that Meyer should promptly make payment to all persons supplying labor and materials for the performance of the subcontracts. Meyer went ahead with the work until September 4, 1942, at which time it was unable to meet its weekly payroll of $9,463.36. It requested Blair by telegram to pay the men. Blair owed Meyer some $85,000 at the time, some $66,000 of which was retained percentages, the balance being then due and payable to Meyer. Blair met the payroll, and on September 5 wrote the plaintiff demanding that the plaintiff complete Meyer's subcontracts with Blair. The plaintiff investigated Meyer's financial condition and found that it was bad. Meyer owed material-men approximately $100,000 and owed an individual $75,000 for money borrowed for the performance of the contract. It had no cash or bank credit. Meyer's spokesman, however, protested the plaintiff's proposed intervention, saying that Meyer had not defaulted and could finish the job at a small profit. Meyer's superintendent on the job estimated that Meyer stood to lose approximately $200,000 on the job. The plaintiff anticipated that the work would be completed in two or three

weeks and did not wish to incur extra expense by formally taking over the completion of the contract.

An arrangement, agreeable to Blair, Meyer and the plaintiff, was made and confirmed in writing, under which the plaintiff was not to take over the job, but Blair was to make no payments to Meyer except upon the specific approval of the plaintiff. As to the disposition of surplus materials which Meyer had on the job, the arrangement was that Mr. Grover Sales, Meyer's attorney, was to sell the property, taking in payment checks payable to Meyer which he would turn over to the plaintiff. Pursuant to the arrangement, needed materials were ordered in Meyer's name, payrolls were submitted to the plaintiff for approval and, when approved, were paid by Blair out of sums due Meyer. Performance of the contract was completed, and the plaintiff incurred no liability to Blair on the performance bonds for nonperformance by Meyer. But the plaintiff did expend $131,984.04 under its payment bonds to pay unpaid bills for materials, and other amounts which brought its loss on its bond obligations to $135,915.70.

The surplus materials which Meyer had caused to be brought to the job were things which had been obtained under Government priorities and were in short supply. They were worth more in the open market than Meyer had paid or promised to pay for them. Two units of the Army Engineers were interested in purchasing them, the Camp Atterbury post engineers, and the Camp Atterbury area engineers. They negotiated with Meyer's superintendent and purchased some of the materials in September and October 1942. Invoices in Meyer's name were presented to the engineers, and purchase orders naming Meyer as seller were issued by the engineers. A check of the post engineers for $1,266.- 51, payable to Meyer, in payment for some of the materials, was given to Meyer's superintendent, and was deposited, pursuant to the arrangement described above, in a joint account of Meyer and the plaintiff. Its disposition is not in question here.

On December 16, 1942, more than a month after the sales here involved had been made, the plaintiff notified the engineers of its interest in the payment for the surplus materials, and requested that checks in payment for them should be made payable to the plaintiff. Meyer's attorney advised the engineers in 1945 that the amounts owing for the materials should be set off against Meyer's taxes, and that if that was not done, the failure to do it would be used as a defense if the Government attempted to collect the taxes from Meyer. The Government has not paid either the plaintiff or Meyer $19,- 627.92, the agreed price of surplus materials purchased by it. Meyer incurred tax liabilities for 1942 under the Federal Insurance Contributions Act, 26 U.S.C. § 1400 et seq. and the Federal Unemployment Tax Act, 26 U.S.C. § 1600 et seq. nearly all of which indebtedness arose out of the Camp Atterbury job. The taxes amounted to $24,825.68 and have not been paid, except by way of the set-off here asserted by the Government.

■ Meyer's assignment to the plaintiff, recited above, of materials on the job, as collateral security for the fulfillment of its obligations to Blair, for which the plaintiff became surety, was a chattel mortgage under Indiana law. Maple v. Seaboard Surety Co., 117 Ind.App. 627, 73 N.E.2d 81. That assignment was to become effective upon stated conditions. We think the conditions were fulfilled. When the plaintiff investigated Meyer's financial condition in September 1942, and discovered unpaid material bills for $100,000, a debt of $75,000 for money borrowed to carry out the contract, no cash and no bank credit, and some $76,000 owing to Meyer from Blair, it was evident that the plaintiff would suffer losses on its payment bonds. The plaintiff had a right to protect itself as far as possible against any increase in those losses by taking charge of all payments to be thereafter made by Blair to Meyer. It insisted on and obtained the arrangement described above whereby its approval was required for such payments. Its permitting the Meyer superintendent and working force to continue

during the short remaining time required for the completion of the contract was an economical arrangement saving the expense which would have been incurred by a formal taking over of the contract and the recruiting of a new force. The men were paid out of money furnished by Blair, which Blair owed to Meyer but which the plaintiff controlled by insisting upon its not being spent without the plaintiff's approval. We think that the plaintiff did, in effect, take over the job, and that nothing was lacking except an expensive formality. As between the plaintiff and Meyer, then, the assignment took effect as a chattel mortgage.

■ The assignment was not recorded. The Indiana Chattel Mortgage Act, Acts of 1935, c. 147, § 4, 10 Burns' Ann.Ind. Stats. § 51–504, says:

"Any chattel mortgage or other pledge of personal property, which has not been filed for record in accordance with the terms and provisions of this act, shall be invalid and ineffectual as against all subsequent mortgagees, purchasers and/or creditors of the mortgagor, without actual notice thereof."

The Government urges that it is not bound by Meyer's chattel mortgage to the plaintiff. It seems to assert that the mortgage was invalid as to everyone except the parties to it. We think the statute is quite explicit in its statement of what the effect of non-recordation should be, and that only those mentioned in the statute gain an advantage from the non-recordation. The question then is whether the Government was a "purchaser and/or creditor of the mortgagor without actual notice" of the mortgage, within the meaning of the statute. So far as concerns notice, we think the Government did not have notice, or knowledge which should have put it on notice, of the plaintiff's interest in the property. The property remained under the control of the same persons who had been, and still appeared to be, Meyer's agents. The Government was dealing only with Blair, so far as the performance of the contract was con-

cerned, and its agents were under no duty to follow up casual bits of conversation which were of no interest to the Government.

■ Was the Government a purchaser from Meyer, within the meaning of the statute? It was, of course, a purchaser within the broad meaning of that word. It bought the materials from Meyer, and promised to pay for them. But the word purchaser, as used in the expression "purchaser for value" in connection with the cutting off of equities of other persons in the property in question, means a person who parts with something of value in reliance upon the apparent good title which the seller has in the property sold. If property subject to a trust or other equity unknown to the purchaser is transferred to him in satisfaction of a pre-existing debt, he does not, according to the weight of authority, have the status of a purchaser for value, and does not acquire rights superior to the equities of which he was not aware. See Scott on Trusts, Section 304, citing to that effect Petry v. Ambrosher, 100 Ind. 510; Tarkington v. Purvis, 128 Ind. 182, 25 N.E. 879, 9 L.R.A. 607; Orb v. Coapstick, 136 Ind. 313, 36 N.E. 278. The instant case varies from the usual pattern of such cases in that the Government probably intended to pay cash for the materials but after they were bought and before they were paid for, Meyer's indebtedness to the Government for taxes was discovered and the set-off now relied on was asserted. We think that the fact that the property may not have been intended to be transferred in satisfaction of a pre-existing debt does not make the rule described above less applicable. It may be of interest to observe that if the Government had paid for the materials by check, as the engineers probably intended to do, the payment would, under the arrangement described earlier in the opinion, have gone into the fund controlled by the plaintiff, and would have been applied to reduce the plaintiff's loss on its bond obligation.

■■ We are concerned here, not with the question of who is a purchaser for

value within the meaning of the equitable maxim "where the equities are equal the legal title prevails" but of who is a purchaser for value within the meaning of the Indiana mortgage statute. In the absence of a showing of a contrary legislative intent, words in a statute which have a recognized common law meaning are presumed to be used with that meaning. In the Uniform Sales Act and the Uniform Negotiable Instruments Act, the legislative draftsmen decided to change the common law meaning of the words "purchaser for value" to make them include one who took in payment of an antecedent debt, and they said so in specific words. Scott Op.Cit. Sections 304, 304.1. We conclude, therefore, that the Government was not a purchaser for value, and did not, therefore, acquire, by reason of that status, rights superior to those of the plaintiff merely because the plaintiff's mortgage was unrecorded.

■ The Indiana statute also names "creditors" among those who acquire rights superior to those of a chattel mortgagee who has·not recorded his mortgage. The Government was, or became, a creditor of Meyer with regard to the taxes which it here seeks to use as a set-off. But our understanding is that the word "creditor" as used in such statutes is limited to creditors who have acquired a lien upon the property, such as judgment creditors, and does not include general creditors. Our attention has not been called to any Indiana interpretation of its statute inconsistent with the usual interpretation. We think that the United States, as a general creditor of Meyer, did not, merely because the mortgage was not recorded, acquire rights superior to those of the plaintiff.

[8, 9] A doctrine, apparently peculiar to the law of Indiana, prevents recovery by the plaintiff. In the case of Universal Discount Corporation v. Brooks, 115 Ind.App. 591, 58 N.E.2d 369, the Court held that an *unacknowledged* chattel mortgage, though physically recorded and indexed, had no status whatever as against third persons, in that case general creditors. The Court's language was even broader and suggested that the instrument had no validity whatever. In Maple v. Seaboard Surety Company, 117 Ind.App. 627, 73 N.E.2d 80, the Court held that the language used in the Universal Discount case was too broad, and that an unacknowledged and unrecorded chattel mortgage was valid as between the parties, so that the mortgagee could replevin the chattels covered by the mortgage from a third person who had possession of them but no property interest in them. But the Maple decision did not overrule the Universal Discount decision that an unacknowledged chattel mortgage is invalid as against general creditors of the mortgagor. We must take that decision, extreme as it is, as the authoritative construction of the Indiana statute.

Meyer's application to the plaintiff for the bonds, which application is the chattel mortgage upon which the plaintiff's rights, if any, depend, was not acknowledged. It was, therefore, both unrecorded and unrecordable. The situation is, therefore, precisely what it was in the Universal Discount case. The Government, as a general creditor of Meyer, may assert its rights as such in complete disregard of any rights which the instrument in question may have created between Meyer and the plaintiff. A fundamental right of any creditor is that of set-off. Since Meyer owes the Government for unpaid taxes more than the Government owes Meyer for the materials purchased, the set-off exhausts the funds, and the plaintiff is not entitled to recover. The plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.